907 F.2d 810
 Robert IRON EYES, Appellant,
v.
Dan HENRY (Assistant Superintendent) individually and
official capacities; Joe Rosenberg (Captain) individually
and official capacities; Charles E. Harris (Major)
individually and official capacities; Dennis Dowd, in his
individual and official capacities, Appellees.
 No. 88-2586.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 12, 1989.
Decided July 3, 1990.
 
 H. Todd Iveson, St. Louis, Mo., for appellant.
 Erwin O. Switzer, III, St. Louis, Mo., for appellees.
 Before JOHN R. GIBSON, Circuit Judge, HEANEY, Senior Circuit Judge, and MAGILL, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Robert Iron Eyes appeals from the district court's[1] order dismissing his complaint for damages and injunctive relief under 42 U.S.C. Sec. 1983 (1982). Iron Eyes is a Sioux Indian and was an inmate at Missouri's Farmington Correctional Center.[2] He challenges a prison grooming regulation which requires all prisoners to wear their hair above their collars. Iron Eyes has had his hair cut twice under this rule. After a non-jury trial, the district court entered an order denying him all relief and dismissing his complaint with prejudice. This appeal followed. We affirm the district court.
 
 I.
 
 2
 Iron Eyes was born on the Standing Rock Reservation in Fort Yates, North Dakota, and is an enrolled member of the Standing Rock Sioux Tribe. He was raised in the ways of the Sioux culture and has followed the traditional practices of Sioux religion since his youth. Iron Eyes identifies his religion as the pipe religion. Among the tenets of his religion are the pipe ceremony, the sun dance, the ghost dance, and the use of a sweat lodge. These last two tenets are prohibited at Farmington. Iron Eyes also follows other traditional practices of his religion, including the wearing of long hair.
 
 
 3
 This case revolves around Iron Eyes' desire to grow his hair longer than is allowed under the prison regulation. He believes that his hair is a gift from the Great Spirit, and he considers cutting his hair, except to symbolize grief for the loss of a loved one, to be an offense to the Creator. Iron Eyes has had his hair cut five times during his twenty-seven years. The first three times he cut his hair by choice, in mourning for the loss of a loved one, consistent with the Sioux religion. The last two times his hair has been forcibly cut because of a Missouri prison grooming regulation.[3] These last two instances gave rise to the lawsuit currently before us.
 
 
 4
 Iron Eyes' most recent incarceration began in October, 1987.[4] During an earlier one-year term at Farmington, no attempt was made to cut his hair. At the start of his second term, however, Iron Eyes was directed to cut his hair by a Corrections Supervisor, Captain Joe Rosenberg. Iron Eyes protested, arguing that his religious beliefs, as a Native American, required him to wear long hair. Captain Rosenberg then requested that Iron Eyes' record be reviewed for proof of his heritage. According to Captain Rosenberg, this search uncovered no indication that Iron Eyes was a Native American.
 
 
 5
 Nothing further was done concerning Iron Eyes until December of 1987. At that time he was again ordered to have his hair cut to conform with the requirements of the grooming regulation. When he refused, he was removed to disciplinary segregation and, while shackled and handcuffed, his hair was cut by a prison barber. On March 3, 1988, Iron Eyes instituted this action by filing a pro se complaint under 42 U.S.C. Sec. 1983.
 
 
 6
 Ten months passed before Iron Eyes' hair again became an issue. On September 22, 1988, he was again ordered to have his hair cut to conform with the grooming regulation. Four days later he obtained a temporary restraining order barring prison officials from cutting his hair.
 
 
 7
 On October 13, 1988, Iron Eyes filed a second amended complaint which prayed for injunctive relief to prevent any further cutting of his hair and compensatory and punitive damages for the hair cutting incident in December of 1987. Until this preliminary injunction hearing, Iron Eyes had not attempted to gain permission to wear his hair long under the exception for Native Americans in the grooming regulation. See Div. Rul. 116.050(3)(A). After the hearing, Iron Eyes provided Farmington officials with written proof that he was an enrolled member in the Standing Rock Sioux Tribe. Dennis Dowd, Superintendent of Farmington, then forwarded this information, pursuant to Rule 116.050(3)(A), to the Zone Director of the Division of Adult Institutions, who denied Iron Eyes permission to wear his hair long under the exception to the regulation. Following this denial, a bench trial was held, after which the district court entered an order in favor of the Farmington officials. Iron Eyes then requested a temporary injunction, pending appeal, which the district court denied. Soon thereafter, he filed a similar motion with this court. While this motion was pending before us, Iron Eyes was once again given the choice of disciplinary segregation or cutting his hair. Again, he complied with the officials' order rather than face further punishment. Iron Eyes appeals the district court's judgment.[5]
 
 II.
 
 8
 Initially we recognize "that issues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-suited to judicial resolution, and that, accordingly, courts should be loath to substitute their judgment for that of prison officials and administrators." Pitts v. Thornburgh, 866 F.2d 1450, 1453 (D.C.Cir.1989). See Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987). Nevertheless, because prison inmates "do not forfeit all constitutional protections by reason of their conviction and confinement in prison," Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), "federal courts must take cognizance of the valid constitutional claims of prison inmates." Turner, 482 U.S. at 84, 107 S.Ct. at 2259. Valid constitutional claims include actions based on an inmate's free exercise rights under the first amendment. See Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).
 
 
 9
 To support his position, Iron Eyes relies primarily on Teterud v. Burns, 522 F.2d 357 (8th Cir.1975), in which we held that a prison hair regulation impermissibly infringed upon a Native American's first amendment right to freely exercise his religious beliefs because "[t]he proof at trial established that the legitimate institutional needs of the penitentiary can be served by viable, less restrictive means which will not unduly burden the administrator's task." Id. at 362. While Teterud has not been expressly overruled, we have limited it to its facts. See Butler-Bey v. Frey, 811 F.2d 449, 451 (8th Cir.1987) (upholding a prison ban on fezes because of the risks of concealed contraband); Hill v. Blackwell, 774 F.2d 338, 347-48 (8th Cir.1985) (upholding a prison regulation on beard length). Further, the least restrictive means test we applied in Teterud has been rejected by the Supreme Court. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 350, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987); Turner, 482 U.S. at 89, 107 S.Ct. at 2261.
 
 
 10
 A prisoner's free exercise claim is currently "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone, 482 U.S. at 349, 107 S.Ct. at 2404. The specific standard of review for such a claim was set out by the Court in Turner: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89, 107 S.Ct. at 2261. These penological objectives include rehabilitation, deterrence, and security. O'Lone, 482 U.S. at 348, 107 S.Ct. at 2404. In Turner the Court discussed several factors for determining the reasonableness of the regulation at issue: (1) whether there is a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest used to justify it; (2) whether there exist alternative means for prisoners to exercise the constitutional right at issue; (3) the impact that would be caused by accommodation of the right on prison staff, inmates, and allocation of prison resources; and (4) whether any alterative exists that would fully accommodate the prisoner's rights at de minimis cost to valid penological interests. Turner, 482 U.S. at 89-91, 107 S.Ct. at 2261-63.
 
 III.
 
 11
 Before the Turner factors are applied to a prisoner's free exercise claim, the inmate must first establish the existence of a sincerely held religious belief, and that the challenged regulation infringes upon that belief. See Hill, 774 F.2d at 342-43. On appeal, Farmington officials contend that Iron Eyes did not sincerely hold a religious belief against the cutting of his hair. To support this position, they argue first that Iron Eyes' belief was not sincerely held, and second that wearing long hair is not an essential tenet of his religion. The district court considered both the sincerity of Iron Eyes' belief and the basis for that belief, and held that his need to wear his hair long was religious in nature and sincerely held. The court noted that Iron Eyes had maintained Sioux religious beliefs throughout his life, and that he had participated in religious ceremonies whenever possible. The court also recognized the importance of wearing long hair to Native Americans, citing Teterud, 522 F.2d at 360 n. 6. The court's determination that Iron Eyes' desire to abstain from cutting his hair was based on a sincerely held religious belief is factual in nature and thus is subject to the clearly erroneous standard of review. See Butler-Bey, 811 F.2d at 450. From our review of the record, we cannot conclude that this determination is clearly erroneous. Therefore, we now review the questioned regulation under the factors discussed in Turner. Since the district court's application of these factors is based upon the application of legal principles to subsidiary facts, we undertake a de novo review. See Hill, 774 F.2d at 343; Salaam v. Lockhart, 856 F.2d 1120, 1122 (8th Cir.1988).
 
 A.
 
 12
 Under the first Turner variable, "we must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." Thornburgh v. Abbott, --- U.S. ----, 109 S.Ct. 1874, 1882, 104 L.Ed.2d 459 (1989). Farmington officials advance two reasons for the grooming policy at issue in this case: (1) to prevent prisoners from concealing contraband; and (2) to alleviate confusion in prisoner identification. These are both security concerns, and security is clearly a valid penological objective. See O'Lone, 482 U.S. at 348, 107 S.Ct. at 2404. Further, in light of the Native American exception to the regulation, we believe it is neutral. It is true that Iron Eyes was denied his request for exemption from the regulation, but that denial is not the issue before us today, and we do not consider it. Thus, since the grooming regulation is legitimate and neutral, the only remaining issue concerning the first Turner factor is whether the regulation is rationally related to the security objectives identified by the Farmington officials. The district court found that there was a logical connection between the regulation and objectives; we see no reason to disagree.
 
 
 13
 The Farmington officials contend that long hair would facilitate the smuggling of contraband. Iron Eyes counters by arguing that numerous other options exist for prisoners who wish to smuggle contraband, such as bonnets, handkerchiefs, and large boots, all of which are allowed by Farmington officials. (Tr. 112). The mere existence of other options for smuggling, however, does not sever the link between the regulation and the officials' security concerns. We are also not convinced by Iron Eyes' argument that contraband could be smuggled in an inmate's hair within the length set by the regulation, nor by his argument that contraband has never been found in an inmate's hair at Farmington. Therefore, we conclude that there is a logical connection between the grooming regulation and the Farmington officials' desire to prevent the smuggling of contraband. See Pollock v. Marshall, 845 F.2d 656, 658-59 (6th Cir.), cert. denied, 488 U.S. 987, 109 S.Ct. 239, 102 L.Ed.2d 228 (1988); Martinelli v. Dugger, 817 F.2d 1499, 1506 n. 23 (11th Cir.1987), cert. denied, 484 U.S. 1012, 108 S.Ct. 714, 98 L.Ed.2d 664 (1988); Cole v. Flick, 758 F.2d 124, 126-27, 131 (3d Cir.), cert. denied, 474 U.S. 921, 106 S.Ct. 253, 88 L.Ed.2d 260 (1985).
 
 
 14
 Farmington officials also argue that long hair would enable a prisoner to quickly alter his appearance to avoid detection upon escape or within the Farmington facility. They state that if a prisoner escapes, photocopies of his prison photograph are distributed to law enforcement officials to aid in the escapee's apprehension. Farmington officials contend that a prisoner with long hair could either keep it long or cut it off, possibly changing significantly his appearance from his initial prison photograph, and thus necessitating multiple pictures to ensure that law enforcement officials have at least one photograph matching the prisoner's appearance. Iron Eyes argues that rephotographing is simply a nuisance, which could be achieved easily, and further that he was never photographed with short hair, despite the fact that his hair was forcibly cut twice while incarcerated. We cannot deny the strength of Iron Eyes' argument here. If identification concerns are so important for security, it is incredulous that the prison officials, after forcibly cutting Iron Eyes' hair, failed to rephotograph him. Regardless, the officials' security fears concerning identification create a rational link between that objective and the regulation. Allowing prisoners to wear long hair would enable them to quickly alter their appearance, and could conceivably hinder their identification, whether inside or outside the walls of the Farmington facility. See Pollock, 845 F.2d at 658-59; Cole, 758 F.2d at 126, 128-29.
 
 
 15
 Accordingly, we hold that the district court properly found a rational nexus between the short hair regulation and the valid neutral penological concerns behind it.
 
 B.
 
 16
 The second factor that "the Court in Turner held to be 'relevant in determining the reasonableness of a prison restriction ... is whether there are alternative means of exercising the right that remain open to prison inmates.' " Abbott, --- U.S. ----, 109 S.Ct. at 1883 (quoting Turner, 482 U.S. at 90, 107 S.Ct. at 2262). Iron Eyes argues that the right in this case is to grow his hair in conformity with his religion. We cannot adhere to such a narrow definition of "the right" at issue. "As has already been made clear in Turner and O'Lone, 'the right' in question must be viewed sensibly and expansively." Id. Accordingly, the actual "right" in this case concerns Iron Eyes' ability to freely practice his religion. Although several of the practices important to his religion are not permitted by the regulations at Farmington, including the ghost dance, the use of a sweat lodge, and allowing one's hair to grow, others are allowed. These include meeting with other Native Americans to perform pipe ceremonies and the sun dance. Certainly, the short hair regulation places hardship on Iron Eyes, but by breaking the law, a prisoner brings upon himself "the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." O'Lone, 482 U.S. at 348, 107 S.Ct. at 2404 (quoting Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)). Since the regulation at issue does not preclude Iron Eyes from practicing some of the tenets of his religion, this factor also favors the prison officials.
 
 C.
 
 17
 The next Turner factor concerns the impact that accommodating Iron Eyes would have on the guards, other inmates, and allocation of prison resources at the Farmington facility. Farmington officials indicate that prisoners with long hair would require more attention, including additional pat-down searches, because of the increased risk of contraband smuggling. They state that these searches would also take longer because of the necessity of carefully searching the longer hair. This would stretch already scarce prison resources by forcing guards to spend more time monitoring a small number of inmates. Further, it would increase the risk to guards, because of the close proximity required and the animosity generated by such searches. The cost of these searches cannot be easily measured, but we cannot find error in the district court's finding that striking this regulation would come at the cost of a significant loss of safety to others.
 
 
 18
 Farmington has only a small number of Native Americans.[6] The Farmington officials argue that exempting Iron Eyes from the grooming regulation could create prisoner friction and unrest at their facility. The danger of prisoner friction and unrest resulting from giving, or appearing to give, special treatment to one group of prisoners has been recognized by several courts. See Fromer v. Scully, 874 F.2d 69, 76 (2nd Cir.1989); Martinelli, 817 F.2d at 1506 n. 23; cf. O'Lone, 482 U.S. at 353, 107 S.Ct. at 2406. We believe that these concerns are valid, and that this is a situation where it is appropriate for courts to defer to prison officials "who are actually charged with and trained in the running of the particular institution under examination." Id. at 349, 107 S.Ct. at 2404 (quoting Bell, 441 U.S. at 562, 99 S.Ct. at 1886).
 
 D.
 
 19
 Under the final Turner factor, we must ascertain whether an obvious, easy alternative to the current regulation exists, and if one does exist, if it can be implemented at a de minimis cost to valid penological interests. See Turner, 482 U.S. at 90-91, 107 S.Ct. at 2262-63. The only viable alternative, in light of our consideration of the previous factors, the Native American exception to the grooming regulation, has already been implemented.[7] Any other solution would come at more than a de minimis cost to valid penological interests.
 
 
 20
 The regulation allowed Native Americans, with permission of prison officials, to grow their hair longer than allowed by the short hair regulation. Iron Eyes sought such an exemption and failed. It is not clear if he had any administrative appeal option of that decision. Regardless, the exemption option was open to him. This option allowed the zone director to make an exception to the short hair rule if he deemed it appropriate for the prisoner and the prison. As set out previously, any prisoner with long hair would create problems; this exception simply allows the corrections officials to decide when such problems would be outweighed by the resultant benefits. According to the record, three Native Americans at the Farmington facility, including Iron Eyes, have applied for this exemption, and none have been granted. Again, we believe that this is an area where courts should defer to the "informed discretion of corrections officials." Turner, 482 U.S. at 90, 107 S.Ct. at 2262.
 
 IV.
 
 21
 Although we recognize how important the growing of his hair is to Iron Eyes, we simply cannot, under the Turner factors, justify striking the short hair regulation at issue. This does not mean that in the future Iron Eyes, or an inmate similarly situated, could not administratively appeal a denial by the zone director of a hair length exemption, or challenge the constitutionality of the regulation as applied to him.
 
 
 22
 Recently two of the other circuits have faced somewhat similar issues with differing results. See Fromer v. Scully, 874 F.2d 69 (2d Cir.1989) (prison regulation which prohibited inmates from wearing beards longer than one inch in length did not violate the free exercise rights of an Orthodox Jew), and Whitney v. Brown, 882 F.2d 1068 (6th Cir.1989) (prison policy which eliminated Jewish inmates' intercomplex travel to weekly Sabbath services and annual Passover Seders was an impermissible infringement upon the Jewish inmates' free exercise rights).
 
 
 23
 Although we affirm the district court, we have serious concerns regarding the position of the State in two respects. First, Iron Eyes was initially required to present proof that he was a Native American. Iron Eyes' prison photographs, which were in evidence in this case, together with his name, make this request an action just short of harassment. Second, we were deeply concerned that, while a motion for temporary injunction pending appeal was pending before this court, Iron Eyes was given the choice of disciplinary segregation or a hair cut, and he elected to comply with the order rather than face punishment. Such action in appropriate circumstances may require that we consider sanctions for contempt.
 
 
 24
 In this case the impingement of Iron Eyes' right to free exercise of religion is outweighed by the validity of the regulation under the Turner criteria. Accordingly, we affirm the district court's order.
 
 
 25
 HEANEY, Senior Circuit Judge, dissenting.
 
 
 26
 I dissent. First, the Missouri hair-length regulation unreasonably infringes upon the religious beliefs of Native American inmates because it does not require that exemptions be granted on religious grounds absent the misbehavior of the individual seeking the exemption. The regulation permits exemptions only in the unfettered discretion of prison authorities. The record reveals that no Native American at Farmington has ever been approved for an exemption. This arbitrary discretion over exemptions is unjustified because there is no credible evidence that allowing exemptions to a handful of prisoners is harmful to the security or efficient administration of a prison. Second, the regulation, even if facially valid, was applied to Iron Eyes in an unconstitutional and arbitrary manner. His complaint properly raises issues particular to the brutal application of the regulation to him, and he is entitled to his day in court on these claims.I.
 
 
 27
 Iron Eyes' pro se complaint set forth the following allegations:
 
 
 28
 On or about December 10, 1987, I received an order from Major Charles E. Harris that I was to get a haircut before 4:00 p.m., or that I would be locked up in the hole if I did not get it cut. I tried to explain to Maj. Harris that I am a full-blooded native American Indian and Maj. Harris told me that I was not an indian as there are no indians in his prison system and that I was really a white boy trying to get over on him. I even told Maj. Harris that he could look in my files and see that I am really an indian and verify my heritage but he said that was all lies too. Well, since I did not want my hair cut Maj. Harris handcuffed me and put me in the hole.
 
 
 29
 On December 14, 1987, just before Christmas, Maj. Harris, Capt. Rosenberg and about 9 or 10 other guards handcuffed me behind my back real hard and put leg shackles on me and made me go in a room with all of them. Then they shoved a table in front of the door so nobody could get out. Then, Dan Henry, the Asst. Supt. said that I am going to get a hair cut one way or the other and that they didn't care if I was Geronimo. I told them that the courts also said us indians could keep our hair and Dan Henry said for me and the court to go and fuck our selfs. I am sorry about that word but that is what he really said.
 
 
 30
 Well, Dan Henry, Maj. Harris, Capt. Rosenberg and the guards all took my leg shackles and handcuffs real hard and held me down and this inmate barber named Earl Wells came over and cut my hair into a raggedy mess. That is when they all started laughing and Maj. Harris said that now I could get some white religion.
 
 
 31
 ... I have filed many grievances about it but they tell me that I am not a nigger and that if I was I could have anything I wanted from the place because of the court.
 
 Complaint (Mar. 5, 1988).[1]
 
 32
 Counsel was appointed and an amended complaint was filed, repeating the same allegations and making additional claims. Iron Eyes also alleged that when he was admitted to the institution, an "Indian card" was placed in his file as proof of his enrollment as a Sioux Indian.[2] He further alleged that the defendants were aware of this documentation at the time his hair was first cut and subsequently removed all evidence of Iron Eyes' heritage from his file.[3] The amended complaint alleged that the defendants' actions caused physical and emotional injury. Iron Eyes asked for damages and injunctive relief. In their answer, the defendants admitted that Iron Eyes told them he was a Native American before they cut his hair.
 
 
 33
 The district court issued a restraining order in Iron Eyes' favor and held a hearing to consider granting a preliminary injunction restraining the defendants from cutting Iron Eyes' hair. In violation of the restraining order, Iron Eyes was placed in disciplinary segregation for failing to cut his hair--"not for not cutting his hair, but for disobeying a direct order to cut his hair."[4] Dowd testified that he never submitted Iron Eyes' request for an exemption to the Zone Director because Iron Eyes never provided Dowd with written proof of his heritage. Mem. Op. at 8 (Oct. 11, 1988). The court granted a preliminary injunction pending a second hearing to decide the merits and encouraged Iron Eyes to apply for the exemption. While the preliminary injunction was in effect, Iron Eyes was again cited for failing to cut his hair with the punishment postponed.[5]
 
 
 34
 At the hearing to decide the merits, the defendants advanced two reasons for the rule: to facilitate identification of prisoners and to prevent concealment of contraband while reducing the need for close searches of prisoner hair. Mem. Op. at 8 (October 24, 1988). With respect to the first reason, the court found that Iron Eyes' initial photograph was taken when he had long hair and that he was never rephotographed after any of the haircuts. Id. With respect to the second reason, the court found that Iron Eyes had never attempted to smuggle or hide weapons, keys, or drugs on his person during his incarceration. Id. at 4. In addition, the court found the record unclear as to whether documentation had been previously placed in Iron Eyes' prison file regarding his heritage. Id. at 10.[6] There was no discussion of why Iron Eyes' request for an exemption was denied.
 
 
 35
 The district court denied relief, applying the four Turner factors. The court found that Iron Eyes' beliefs were religious in nature and were sincerely held. Id. at 14. The court also found that the regulation infringed on his religious beliefs. Id. The court concluded, however, that long hair posed a "potential" or conceivable threat to prison security even though the court had found as a fact that Iron Eyes had never smuggled any items and that no contraband items had ever been found in any inmates' hair in the recollection of the defendants. Id. at 14-15. The court also concluded that alternative means of religious expression remained and that alternatives to the regulation would impose more than a de minimis cost. Id. at 15-16. Iron Eyes appealed.[7] He has since been released from confinement.
 
 II.
 
 36
 I agree with the majority that because of Iron Eyes' release, the only issue before us is the district court's denial of damages. We therefore need consider only the reasonableness of the hair-length regulation as it existed when this dispute arose and the way it was applied in this case.[8] Initially, I conclude that the regulation is infirm for not setting forth criteria requiring that an exemption be allowed for qualified Native Americans, absent specific conduct demonstrating that the exemption is undeserved.
 
 A.
 
 37
 Under Turner v. Safley, 482 U.S. 78, 89-91, 107 S.Ct. 2254, 2261-63, 96 L.Ed.2d 64 (1987), we apply four factors to determine if the regulation is reasonable: (1) whether it validly and rationally advances a neutral and legitimate government interest; (2) whether the prisoner has alternative means of exercising the same right; (3) the effect proposed accommodations will have on prison resources; and (4) whether the existence of "obvious, easy alternatives" that impose a de minimis cost reflects the regulation's lack of reasonableness. Turner, 482 U.S. at 89-91, 107 S.Ct. at 2261-63.
 
 
 38
 The majority correctly notes that Turner has superseded the legal test stated in Teterud v. Burns, 522 F.2d 357, 359 (8th Cir.1975). The defendants no longer must choose the least restrictive means possible in furthering administrative interests when constitutional rights are implicated. Thornburgh v. Abbott, 490 U.S. ----, ----, 109 S.Ct. 1874, 1880, 104 L.Ed.2d 459, 471 (1989); O'Lone v. Estate of Shabazz, 482 U.S. 342, 350, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987); Turner, 482 U.S. at 90-91, 107 S.Ct. at 2262-63. We must instead decide whether the regulation at issue is a reasonable way to address the issue, and we do not second-guess choices between reasonable policies. O'Lone, 482 U.S. at 349, 107 S.Ct. at 2404.
 
 
 39
 While our inquiry is limited to the reasonableness of the policy adopted, our scrutiny of the record is not to be "toothless." Abbott, at ----, 109 S.Ct. at 1882, 104 L.Ed.2d at 473 (citing the government's certiorari petition).
 
 
 40
 Our usual prefatory declaration that prisoners retain certain basic constitutional rights has meaning. We would misconstrue the recent Supreme Court decisions in Abbott, O'Lone, and Turner if we deferred not only to the choices between reasonable policies made by prison officials but to their justifications for the policies as well.... We must make sure after an independent review of the evidence that the regulation is not an exaggerated response to prison concerns. Abbott [at ----, 109 S.Ct. at 1884], 104 L.Ed.2d at 476; Turner, 482 U.S. at 96-99 [107 S.Ct. at 2265-67] (finding Missouri prison marriage regulations unreasonable after an independent review of the evidence.)
 
 
 41
 Bilal Ali-Salaam v. Lockhart, 905 F.2d 1168, 1171 (8th Cir.1990) (Salaam II ). This observation has special force where there is plenty of accumulated real-world evidence and we do not need to rely wholly on the speculations of prison officials who admit that they have no empirical support for their position. In addition, "we cannot validate prison regulations that are clearly broader in their scope or significantly more burdensome in effect than reasonable alternatives. Turner, 482 U.S. at 91, 107 S.Ct. at 2262 (relatively unburdensome alternatives can demonstrate unreasonableness). Nor do alternatives have to be entirely cost-free." Id. (footnote omitted).[9]B.
 
 
 42
 We have already found that the asserted justifications for hair-length regulations are pretextual. In Teterud, the defendant asserted that the hair-length regulation was necessary for easy identification of prisoners and for security against contraband. Yet, in that case the Warden testified that twenty percent of the prison population had been in noncompliance with the hair regulation for the past five months without a single incident. 522 F.2d at 361. Two prison officials from West Virginia and Washington testified that the justifications offered in defense of such regulations "are 'penological myth.' " Id. n. 10. The Supreme Court decisions in Turner, O'Lone, and Abbott do not call this factual conclusion into question. Moreover, Missouri has produced no new evidence to support its position.
 
 
 43
 There is no merit to the contention that a hair-length regulation is necessary to or facilitates identification. The defense presented no evidence that there had ever been an identification problem caused by hair length despite haphazard enforcement of the regulation.[10] Moreover, allowing 4 prisoners out of 1700 to have longer hair for religious reasons aids their identification; it makes them instantly distinguishable. More particularly, from the photos submitted, it appears that the length of Iron Eyes' hair does little to alter his appearance. His hair is long, thin, and stringy; it lies flat against his head. Iron Eyes also possesses distinctively Native American features, facilitating identification. Finally and conclusively, the defendants' conduct in this case is a frank confession of the importance and truth of this concern. Iron Eyes had long hair in his admission photograph and the defendants never bothered to rephotograph Iron Eyes after the haircuts. The defendants' claim that short hair is necessary for easy identification is pretextual.
 
 
 44
 The claim that short hair is necessary for prison security is similarly exaggerated. Dowd admitted that there had never been any contraband discovered in long hair despite a history of lax enforcement of the regulation. The defendants did not offer any evidence that Iron Eyes attempted to smuggle contraband during previous incarcerations. Nor did the defendants introduce any evidence into the record from any jurisdiction with a different policy to support their claims. Plaintiff, in contrast, was able to point to the absence of this evidence. The defendants' case thus amounts to mere declarations that a past practice is harmful without any evidence of actual past problems or changed circumstances. This cannot justify complete and uncompromising disregard for the religious significance of the regulated practice.[11] It is our duty to evaluate the claims of prison officials for exaggeration; these claims are clearly exaggerated.
 
 
 45
 The additional burden imposed on prison officials by requiring limited exemptions is minimal. Perhaps as many as 4 out of 1700 prisoners would have to be double photographed, if that truly is a concern, and would have to have their hair more closely inspected when searches were otherwise conducted. Presently, prisoners are patted down, strip-searched or cavity searched as the situation requires. Searching prisoners' hair for contraband would take at most an additional ten seconds. This is far less than the burden of six additional searches found de minimis in Whitney, 882 F.2d at 1074-78.
 
 
 46
 The majority also bases its conclusion on the defendants' testimony regarding the potential for inmate confrontations with guards during searches and the jealousy of other inmates, two claims the district court did not consider at length. There are several problems with each claim. Initially, the claim that exemptions will increase confrontations with guards is unfounded conjecture. Long hair has been allowed in the past. There was no evidence of past confrontations with guards over the examination of hair. There was also no evidence that Iron Eyes, during his previous years of incarceration, had ever objected to a search of his hair. This concern thus sweeps too broadly. Accommodations under Turner's fourth factor are not automatically made unreasonable or excessively burdensome by the potential misbehavior of others. Salaam II, 905 F.2d at 1175. Moreover, Iron Eyes' free exercise rights are not absolute and would not be compelling in the face of his own misconduct related to the exemption. A reasonable regulation could include sanctions for the abuse of the privilege.
 
 
 47
 The claim that bestowing a special privilege causes jealousy among inmates also sweeps too broadly. First, on this theory, any accommodation of a religious practice where one prisoner was treated differently than another could not be required if other prisoners objected. A Jewish prisoner could not worship on the Sabbath. A Muslim prisoner could not have a pork-free diet. A Catholic prisoner could not take Communion. A Protestant prisoner could not be allowed to travel from his cell for a Sunday service. A rule against differential treatment makes hollow the notion that prisoners retain religious rights. Second, this type of sweeping justification rules out accommodations and thus conflicts with the fourth Turner factor that requires we consider alternatives in assessing a regulation's reasonableness. Third, recognizing this type of justification would have a disproportionate impact on members of minority faiths because the practice at issue might seem unusual to many prisoners. It is thus not enough to say that generally the bestowing of privileges provokes jealousies. The evidence must be particular to the practice and privilege at issue. On the single occasion where the Supreme Court has mentioned such a reaction, the accommodation involved "escaping a rigorous work detail." O'Lone, 482 U.S. at 353, 107 S.Ct. at 2407 (no restrictions on prayer during nonworking hours). In Whitney, the claim that allowing prisoners to move from one cellblock to another to pray together during nonworking hours would provoke jealousy from other prisoners was rejected as unfounded. 882 F.2d at 1077. In this case, the warden's claim is unspecific to the practice at issue.
 
 
 48
 In addition, I note that Missouri prison officials have decided that differential treatment based on behavior is desirable even if it causes jealousies, while differential treatment for free exercise reasons is not. See Mo. Admin. Code Tit. 14, Div. 10, Ch. 5 (good time); id. Div. 20, Ch. 28 (furlough). I understand why prison officials would offer rewards for good behavior in spite of jealousies. That prison officials do not give similar weight to constitutional concerns in deciding whether the merits of a policy are outweighed by prisoner jealousies is also not surprising. Prison officials often do not feel that their primary obligation is the illumination or enforcement of constitutional rights. It is for this reason that our review cannot be passive. Accordingly, I reject the notion of a subjective "prisoners' veto."
 
 
 49
 Finally, the justifications offered by state officials are not supported by the actions of any of their colleagues within this circuit; only Missouri restricts hair length. The federal government does not restrict the hair length of prisoners. 28 C.F.R. Sec. 551.4(a) (1979). Arkansas has no hair-length regulation. See Ark. Dept. of Corrections Admin. Reg. Sec. 840 (1979). Iowa allows unrestricted hair length, except in limited circumstances, and takes two photographs of long-haired prisoners on admission, pulling back the hair for one. See Iowa Dept. of Corrections Policy No. IN-V-12 (1982). Minnesota has no hair-length regulation. Nebraska does not have a state policy on hair length. See Neb. Dept. of Correctional Services Admin. Reg. 116.1. North Dakota does not restrict hair length. N.D. State Penitentiary Reg. Sec. 6. South Dakota does not restrict hair length. This is not a case like Hill v. Blackwell, 774 F.2d at 344-45, where half the surveyed states followed one practice and half followed another. This circuit contains the second highest number of states of any federal circuit in the country, and state prisoners in only one state are subjected to this regulation which we all agree infringes upon religious liberty. This is strong and persuasive additional evidence that the security concerns of the defendants are greatly exaggerated and alternatives impose only a de minimis cost. Cf. Turner, 482 U.S. at 93, 99, 107 S.Ct. at 2263, 2267 (comparisons with federal policy).
 
 
 50
 Accordingly, I conclude that the regulation at issue is infirm. In light of the paucity of nonconjectural evidence that Missouri is able to muster, it must permit a religious exemption to its hair-length regulation absent a particular problem posed by granting the exemption to a particular individual. The unreasonableness of anything less is revealed in the record. At the time this suit was brought, the regulation permitted an exemption but none was ever granted. The majority chooses to read the prisoner's complaint as only presenting the abstract question of whether a hair-length regulation with a religious exemption is reasonable. Certainly the answer must depend on the terms of the exemption.
 
 C.
 
 51
 I also disagree with the election of the majority to treat this case as one involving only the facial validity of the regulation. The complaint challenges the regulation on its face and as applied, asking for damages for violation of religious rights and for the physical treatment of Iron Eyes. Iron Eyes' allegations of mistreatment by the defendants state a claim for the arbitrary and capricious application of the regulation and for the violation of his constitutional rights.
 
 
 52
 First, the amended complaint alleges that despite knowing that Iron Eyes was a Native American, the defendants forcibly cut his hair without giving him time or notice to apply for an exemption. Subsequently, an exemption was denied without explanation. Where a prisoner possesses a liberty interest and the prison has procedures to protect that liberty interest, a section 1983 suit may properly challenge the decision of subordinate employees not to allow a prisoner access to the procedures. Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). The failure of prison officials to state reasons for rejecting Iron Eyes' request and their failure to approve an exemption for anyone else may also state a claim for arbitrary and capricious behavior. Second, the amended complaint also alleges that Iron Eyes was treated in a vicious manner because of his heritage. This states an equal protection claim. Third, the amended complaint alleges that Iron Eyes suffered physical abuse and harassment. This may state a claim for cruel and unusual punishment. See Kent v. Johnson, 821 F.2d 1220, 1227-28 (6th Cir.1987) (malicious and intentional harassment by guards states eighth amendment claim).[12] Finally, the abusive actions of the defendants in cutting Iron Eyes' hair or threatening him with discipline in step with the progress of this suit may state a retaliation claim. See supra notes 5, 7.[13]
 
 
 53
 The district court treated this case as raising only the facial constitutionality of the regulation. I believe the complaint goes further and would remand this case to the district court for consideration of the particular actions of the defendants in enforcing the regulation.
 
 III.
 
 54
 The need for prison officials to be able to efficiently order their institutions is a serious one. The hair-length regulation we review today, however, infringes on religious practice and has little to do with the necessary or even reasonable ordering of prisons.[14] The reasons offered in support of hair-length regulations are long-standing penological myths, and the defendants introduced no actual evidence to support their claims. Accordingly, I would reverse the district court's decision.
 
 
 
 [1]
 The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 Iron Eyes was released from Farmington on June 2, 1989
 
 
 [3]
 The regulation states that:
 (3) Hair will be clean, neatly groomed and no longer than the base of the rear of the shirt collar. Neither extremely long hair nor artificial hairpieces for men will be permitted with the exception indicated below. Afro styles will be of moderate length.
 (A) Those inmates belonging to an indian tribe, who have received a court ruling permitting them to grow long hair, will be allowed to do so. Other inmates who claim to belong to an indian tribe must present written documentation of such to the institution head. The institution head will submit the item to the zone director [of the Division of Adult Institutions] for a final decision as to whether that inmate will be permitted to wear long hair.
 Div.Rul. 116.050(3), Mo.Admin.Code Tit. 14, Div. 20, Ch. 16.
 
 
 [4]
 Iron Eyes was also incarcerated in another Missouri prison, from July, 1986 to July, 1987. He was imprisoned in October, 1987 for violation of parole
 
 
 [5]
 Since Iron Eyes has been released from Farmington during this appeal, the issue of injunctive relief is no longer relevant in this case
 
 
 [6]
 At the time of this litigation only four of Farmington's 1700 inmates were Native Americans. (Tr. 11) (Injunction Hearing Tr. 46)
 
 
 [7]
 The Native American exception was removed by the State after this case was taken under submission
 
 
 [1]
 Iron Eyes' version of the haircut and racial abuse was supported by the deposition testimony of Earl Wells, the white prisoner who performed the haircut. Deposition of Earl Wells at 8, 16 (Oct. 11, 1988)
 
 
 [2]
 Iron Eyes was placed in the medium-security prison for parole violations. Previously, he had been convicted in Missouri of second-degree burglary and was sentenced to six years in jail
 
 
 [3]
 In particular, Iron Eyes alleged as follows: In October 1987, defendant Rosenberg ordered Iron Eyes' hair to be cut pursuant to the prison regulation and Iron Eyes protested. After reviewing Iron Eyes' file, Rosenberg rescinded the order. On December 10, defendant Harris ordered Iron Eyes' hair to be cut. Rosenberg informed Harris and defendant Dowd that there was proof in the file that Iron Eyes was a Native American. Dowd ordered his hair cut anyway. Amended complaint at 4-6
 
 
 [4]
 This is the recollection of a prisoner who was working in the segregation ward at the time. Deposition of Jeffrey Asher at 15 (Oct. 11, 1988). This prisoner also testified that Iron Eyes was confined because when Iron Eyes went to get his legal papers notarized, in the process of notarizing the papers, the officials decided to discipline him for disobeying an order to have his hair cut. Id. Defendant Dowd testified that Iron Eyes' hair was later cut in September 1988 "as a result of defendants' counsel's call to defendant Dowd regarding circumstances pertaining to this lawsuit." Mem. Op. at 8
 
 
 [5]
 The State has argued to us that "[e]ven when the district court granted temporary relief, it restricted only the cutting of hair, and not discipline." Defendants' Response to Plaintiff's Motion for Injunction Pending Appeal at 2 (Feb. 23, 1989). I find this position incredible. Missouri argues that although prison officials were enjoined from cutting his hair, they were entitled to discipline him for not cutting his hair. This makes a mockery of the district court's authority and supports a claim for retaliation for which there can be no immunity under the circumstances
 
 
 [6]
 The court thus did not accept the testimony of defendant Rosenberg that there were no heritage papers in Iron Eyes' file. See Majority Op. at 812 (noting Rosenberg's testimony). Rosenberg's testimony was contested. Wells, the barber, testified that at the time of the haircut, the guards said that they had papers proving that Iron Eyes was a Native American but indicated that they were going to disregard them. Wells Deposition, supra note 1, at 12
 
 
 [7]
 On October 26, 1988, he sought an injunction from us pending appeal. That day he was ordered to cut his hair and was told that if he did not comply, he would be put in segregation, where he would be unable to participate in any religious services. His hair was cut and we deferred judgment, believing the motion to be moot. We heard oral arguments in January 1989. On February 20, he was ordered to have his hair cut again. We granted an injunction pending the issuance of this opinion. There seems to be a pattern here of disciplining Iron Eyes or forcing him to have his hair cut each time he attempts to secure his rights
 
 
 [8]
 After we took this case under submission, the State removed the possibility of an exemption from the hair-length regulation. Department of Corrections and Human Resources Memorandum (March 8, 1989). The majority concludes that the regulation we consider today is neutral and does not reflect animosity toward any distinct group only because it does contain an exemption. Ante at 813-14. Moreover, the majority's application of Turner's fourth factor relies on the existence of the exemption. The constitutionality of the current regulation is thus unresolved because the majority does not consider the effect of a regulation with no exemptions or even the bad faith administration of the former regulation. Ante at 814. I note that we cannot say that there are no possible alternatives to the former regulation because we have not considered all the alternatives that future litigants might suggest
 
 
 [9]
 We noted that:
 The reasonableness test does not obviate the need for accommodation. Reasonableness in this context refers not only to the relation between the goals of a regulation and its means, but also the balance struck between the needs of the prison administrators and the constitutional rights of prisoners. Reed v. Faulkner, 842 F.2d 960, 962 (7th Cir.1988) (Posner, J.). " 'In sum, there must be [a] mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.' " Salaam I, 856 F.2d at 1122 (quoting Hill v. Blackwell, 774 F.2d 338, 340 (8th Cir.1985), quoting Wolff v. McDonnell, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974)); id. at 1124.
 Salaam II, 905 F.2d at 1171 n. 6.
 
 
 [10]
 Apparently, only recently have officials begun to enforce the regulation. The district court found that Iron Eyes had never cut his hair during the ten years previous to his most recent incarceration. These findings suggest that Iron Eyes' hair was never cut during previous confinements within the Missouri prison system
 
 
 [11]
 Accord Whitney v. Brown, 882 F.2d 1068 (6th Cir.1989). In Whitney, Jewish prisoners had for many years maintained a weekly prayer service and yearly Passover service at a state prison. Subsequently, the prison was divided into separate wings with different security levels, and the prison prohibited movement between the complexes for religious reasons. Movement between the complexes allegedly involved strip searches or pat-down searches of each person, enhanced risk of escape, and risk of contraband smuggling. At the time the case was heard, the suit involved the rights of 6 prisoners out of 4500 to attend services. The warden argued that allowing the prisoners to travel between complexes would impose additional burdens on guards who would have to search them, as well as additional paperwork. 882 F.2d at 1070-75, 1077. While these concerns are logically plausible, the court found the fears of the officials greatly exaggerated in light of the facts and concluded that, given the normal volume of traffic, the burdens imposed by allowing the inmates to move were de minimis. Id. at 1074-78. The court said of Turner and O'Lone:
 Perhaps the greatest weakness in the prison officials' arguments is their misunderstanding of Turner and O'Lone as holding that federal courts will uphold prison policies which can somehow be supported with a flurry of disconnected and self-conflicting points. They seem to read Turner and O'Lone as saying that anything prison officials can justify is valid because they have somehow justified it.
 Id. at 1074.
 
 
 [12]
 While the amended complaint alleges that Iron Eyes suffered emotional and physical injuries, the jurisdiction of the district court was premised on 42 U.S.C. Sec. 1983, the first and fourteenth amendments, but not the eighth. If the district court did not believe that the complaint properly stated an eighth amendment claim, amendment of the complaint would be proper
 
 
 [13]
 I know of nothing that would bar Iron Eyes from filing suit on this claim
 
 
 [14]
 Wells, the inmate barber, related another incident where a Native American prisoner was "scalped" by one of the defendants. His hair was cut to the skin in patches around his ears and in other places was left long like a ponytail. Wells Deposition, supra note 1, at 16-17. If true, this makes a mockery of any claim that the defendants were just doing their job in making sure everyone's hair was simply above their collar. Native Americans believe that the hair is tied to communication with God and that without it one cannot get to heaven. Being scalped is a sign of subjugation and humiliation