Ralph THOMAS, Appellant,

v.

Frank O. GUNTER; Karen Shortridge, Superintendent; Robert Houston, Associate Superintendent, Appellees.

No. 93–4058.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1994.

Decided Aug. 11, 1994.

Robert Vail Broom, Omaha, NE, argued for appellant.

Terri M. Weeks, Asst. Atty. Gen., Lincoln, NE, argued, for appellees.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and MELLOY,* District Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Ralph Thomas brought this § 1983 action against officials of the Omaha Correctional Center ("the OCC") and the Nebraska Department of Correctional Services for alleged violations of his First and Fourteenth Amendment rights to the free exercise of religion and equal protection of the laws during his term of incarceration. In his complaint, Mr. Thomas alleges that officials at the OCC limited his right to exercise his religion freely in violation of the Free Exercise Clause of the First Amendment, when they refused to allow him daily access to the prison sweat lodge for prayer.[1] He also asserts that the refusal was a violation of his right to equal protection as guaranteed by the Fourteenth Amendment, since daily access to the prison chapel was scheduled for members of other faiths. Upon the recommendation and report of a magistrate judge, the District Court granted the defendants motion for summary judgment, and this appeal followed.

## I.

■ "[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct de-

prived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981) (overruled in part not relevant here, by *Daniels v. Williams,* 474 U.S. 327, 330–331, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986)). Prison authorities are clearly "person[s] acting under color of state law" within the meaning of the first element. *Parratt,* 451 U.S. at 536, 101 S.Ct. at 1913.

While the question of whether a state actor is involved tends to be an easy one in a prison context, the question of whether there was an impermissible deprivation is more complex. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). We recognize, however, that judgments regarding prison security "are peculiarly within the province and professional expertise of corrections officials, and ... courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974).

■ Whether a deprivation of a prison inmate's Constitutionally protected right is permissible depends upon whether the restriction imposed by prison authorities bears a rational relationship to the furtherance of a legitimate penological interest. *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261; *see also O'Lone v. Estate of Shabazz,* 482 U.S. 342, 350–351, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987). In *Turner,* the Court considered whether Missouri prison regulations restricting inmate correspondence and marriages were constitutionally permissible. *Id.,* 482 U.S. at 91–93, 107 S.Ct. at 2262–63. The Court upheld the restrictions on correspondence, noting the rational relationship between the re-

---

* The HONORABLE MICHAEL J. MELLOY, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation.

1. We disagree with the dissenting judge's position that appellant did not sufficiently alert the district court that he was requesting an opportunity for prayer that was short of a full-blown Sweat Lodge Ceremony. Appellant asked for "the use of a Sweat Lodge for prayer" (Third Amended Complaint, p. 3), and complained of

appellees' "limiting the Plaintiff's access to the Center's sweat lodge to morning hours on weekends and holidays" (*id.*). In his affidavit in support of his Third Amended Complaint, appellant noted that "daily prayer is a necessary and essential tenet of my religious beliefs." We think, fairly construed, that the complaint and affidavit make an issue of the opportunity for daily prayer in the sweat lodge.

**1260**

strictions and prison security. The restrictions upon inmates' rights to marry, however, were stricken as constitutionally infirm. *Id.* at 96, 107 S.Ct. at 2265. The Court outlined four considerations which guided its decision. First, the prison regulation must be rationally related to a legitimate governmental interest. Particular judicial deference is, moreover, owed to regulations where alternative means of exercising the right in question are available to inmates. The Court also examined the effect that accommodation of the asserted right would have on guards and other inmates, and on the allocation of prison resources. Finally, the availability to authorities of alternative measures to further the legitimate governmental interest must go into the balance. *Id.* at 90–91, 107 S.Ct. at 2262.

## II.

We believe that the principles of *Turner* govern the restrictions placed upon Mr. Thomas's attempts to exercise his religion. If OCC policies prevented his exercise of his religion without those policies bearing a rational relationship to a legitimate governmental purpose, then Mr. Thomas's complaint states a valid § 1983 claim.

■ Mr. Thomas complains that he was not permitted to have daily access to the sweat lodge for prayer, and that Muslims and Christians had daily access to an equivalent location for daily prayer. Since the defendants do not deny these assertions, the question under *Turner* becomes whether the limitations on access to the sweat lodge are logically related to a legitimate penological objective. The appellees's simple and unelaborated assertion that decisions concerning access to the sweat lodge were made on the basis of "security-related limitations" gives us little basis upon which to determine if there was some rational relationship between the denial of access and security.

The second consideration under *Turner* is whether Mr. Thomas had alternative means of exercising the same right. Mr. Thomas asserts that the sweat lodge was the only appropriate location for his daily prayer activities. We assume for summary judgment purposes that this assertion is true. Since

there was only one sweat lodge at the OCC, no alternative means of accessing a sweat lodge for daily prayer was available to him.

*Turner* also requires consideration of the effect on prison resources and other inmates of accommodating the inmate's request. The appellees maintain that the amount of time that would have been required each day to accommodate Mr. Thomas's request would have exceeded what they could have permitted administratively. This contention however, appears to assume that Mr. Thomas wished to conduct full sweat lodge ceremonies on a daily basis, whereas the record amply supports the fact that he was complaining about the lack of opportunity for daily prayer.

Mr. Thomas asserts that the effect of allowing daily access for prayer would be *de minimis,* since the sweat lodge is located in a restricted and secured area which already has guards on duty, and since access is already provided on a limited basis with no meaningful impact on prison resources. The appellees do not address the issue of how daily access for prayer would affect prison resources.

■ The final consideration under *Turner* is the availability of alternative means of achieving the penological interests advanced by prison authorities. While it is true that there is no burden upon prison authorities to show that no reasonable alternatives to their policies exist, *Shabazz,* 482 U.S. at 350, 107 S.Ct. at 2405, prison officials are not free to restrict inmates' exercise of their religion arbitrarily and unreasonably. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable...." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262. In the present case, it is difficult to determine whether any alternative policies or procedures might have accommodated Mr. Thomas, since we are unable to discern what penological interests the appellees hoped to advance by restricting his access to the sweat lodge. Until those are delineated, we cannot say whether it is reasonable to believe that these interests would be comprised by allowing daily access to the sweat lodge for brief prayer. Unless such a logical relationship is

shown, summary judgment for the prison officials is improper.

In sum, we believe that after applying all of the considerations that *Turner* mandated, summary judgment for the appellees was improper in this case.

### III.

The appellees maintain that they are entitled to qualified immunity because they did not act with malicious intention to deprive Mr. Thomas of his constitutional rights. For this proposition, the appellees cite *Cleavinger v. Saxner*, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985). This reliance is misplaced, however. *Saxner* was a case in which prison officials sought absolute immunity from liability for various constitutional rights violations. *Id.* at 198, 106 S.Ct. at 499. The Court held that only qualified immunity applied to prison officials. The court reasoned that " '[i]t would not be unfair to hold liable the official who knows or should know he is acting outside the law, and ... insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment.' " *Id.* at 207, 106 S.Ct. at 504 (quoting *Butz v. Economou*, 438 U.S. 478, 506–507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978)).

■ It is true that officials engaged in executive functions, such as the operation of penal institutions, enjoy qualified immunity. This immunity, however, is available only if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *accord Smith v. Marcantonio*, 910 F.2d 500, 501 (8th Cir.1990). The proper inquiry in the present case, therefore, is whether the free exercise of religion within a penal setting is a clearly established right.

It has been "clearly established," since *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam), that prison officials may not deny an inmate "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Id.* at 322, 92 S.Ct. at 1081. In *Cruz*, the Court reinstated a § 1983 suit by a Buddhist inmate who claimed he was denied equal access to the prison chapel and equal opportunity to earn points of good merit for his religious convictions. The Court held that such a complaint articulated violations of the First and Fourteenth Amendments, and therefore stated a cause of action under § 1983. *Id.; see also Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). The Court reasoned that while a special chapel or place of worship need not be provided for every faith, reasonable opportunities must be afforded to all prisoners. *Cruz*, 405 U.S. at 322, n. 2, 92 S.Ct. at 1081, n. 2.

We cannot say, without reasons advanced by the appellees, that they acted reasonably in denying Mr. Thomas daily access to the sweat lodge for prayer. If a rational relationship can be shown between legitimate penological interests and the denial of even brief access to the sweat lodge, such a denial may not have been unreasonable. In the absence of such a justification, the appellees would not be entitled to qualified immunity from § 1983 liability.

### IV.

■ The appellees also maintain that they, as state prison officials sued in their official capacities, are entitled to Eleventh Amendment immunity. It is true that a state is generally not subject to suit by citizens in federal court absent the state's consent. *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057, 57 L.Ed.2d 1114 (1978). This immunity extends to actions against state officials sued in their official capacities. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). The defendant prison officials in the case before us are sued in both their official as well as their individual capacities. Since the Eleventh Amendment bars the action against them in their official capacity, that part of the action must be dismissed. The Eleventh Amendment does not otherwise affect suits against public officials in their individual capacities, however. *Scheuer v. Rhodes*, 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d

90 (1974). Accordingly, Mr. Thomas's complaint against the defendants in their individual capacities states a cause of action upon which relief may be granted.

## V.

Some of the appellees also assert that this appeal is barred by the failure of the notice of appeal to comply with Federal Rule of Appellate Procedure 3(c), which states that:

> A notice of appeal must specify the party or parties taking the appeal by naming each appellant in either the caption or body of the notice of appeal.

The claim is that since Mr. Thomas filed his notice of appeal against "Frank Gunter, et al.," this court lacks jurisdiction over any appellees other than Mr. Gunter. In support of this proposition the appellees cite *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), *Moran v. Farrier,* 924 F.2d 134 (8th Cir.1991), *Madewell v. Roberts,* 909 F.2d 1203 (8th Cir.1990), *United States v. Spurgeon,* 861 F.2d 181 (8th Cir.1988), *United States v. Schneider,* 926 F.2d 777 (8th Cir.1991), and *Goos v. Interstate Commerce Commission,* 911 F.2d 1283 (8th Cir.1990).

This impressive array of precedent might be daunting but for the fact that a closer reading of the rule and each of these cases reveals that Rule 3(c) requires the listing of all *appellants* taking the appeal, and not *appellees* called to respond. All of the cases cited by the appellees are cases which involve the failure to name each appellant taking the appeal. None of the cases referred to concerns the failure to list all appellees. Such a mistaken reading of the rule has been made at least a few times before. *See, e.g., Lackey v. Atlantic Richfield Company,* 983 F.2d 620 (5th Cir.1993); *Chathas v. Smith,* 848 F.2d 93 (7th Cir.1988).

"The purpose of the specificity requirement of Rule 3(c) is to provide notice both to the opposition and to the court of the identity of the *appellant* or *appellants.*" *Torres,* 487 U.S. at 318, 108 S.Ct. at 2409 (emphasis added). Adherence to the rule is intended to prevent vitiation of time limits for filing a notice of appeal contained in Rule 4. *Id.* at 315, 108 S.Ct. at 2407. The appellees do not, and cannot, contend that they were provided with insufficient notice of the identity of the appellant in this case. Nor do they contend that they were not provided with notice of this appeal. Accordingly, we hold that the notice of appeal was not out of compliance with FRAP 3(c), and that we have jurisdiction of appellees Shortridge and Houston as well as Gunter.

## VI.

For the foregoing reasons, we reverse the decision of the District Court and remand this cause for further proceedings consistent with this opinion.

MELLOY, Chief District Judge, dissenting.

As to parts, I, IV, and V of the court's opinion, I concur.

As to parts II and III of the court's opinion, I respectfully dissent. I would affirm the district court's judgment.

In my view, the court's opinion allows the appellant to raise an argument he never presented to the prison officials at the Omaha Correctional Center (the "OCC"), the magistrate judge, or the district court. Specifically, I find no support in the record for the appellant's contention that he wanted to merely conduct half-hour, daily prayers in the sweat lodge. Instead, the record, shows that the appellant consistently and repeatedly requested that he be allowed to pray in the sweat lodge for four hours a day, five days a week.

In his initial grievance filed with the OCC, the appellant requested that Native Americans be given access to the sweat lodge "during the hours of 12:30 p.m.–4:30 p.m." J.A. at 14. In response, the OCC stated that the "site and times selected have security related limitations." *Id.* On May 24, 1989, appellant reiterated his "request that the hours of 12:30 through 4:30 p.m., Monday through Friday, be added to the times in which Native Americans are allowed at the Sweat Lodge, and that no further infringements be taken...." *Id.* at 16. In denying his grievance for a second time, the OCC

stated that "[s]weatlodge use is not scheduled for short intervals following the noon meal, because sweatlodge ceremonies take longer than one half hour to prepare and complete."[1]  *Id.*  Thus, from the OCC's point of view, the appellant was clearly requesting access to the sweat lodge, after the noon meal, for four hours a day, five days a week.  Based on this reasonable construction of the appellant's grievance, the OCC officials properly denied the appellant's request.

Dissatisfied with the OCC's response, the appellant filed a complaint in federal court on August 6, 1990, alleging that he "was denied daily access to the Sweat Lodge between the requested hours of 12:30 p.m. to 4:30 p.m., Monday through Friday for the purpose of making prayers, making tobacco ties and placing tobacco ties as instructed by Native American Medicine...."  *Id.* at 36.  Appellant filed a second amended complaint on June 17, 1992, and although he dropped the "12:30 to 4:30" language, his second amended complaint made no reference to half-hour, daily prayers.  Instead, his second amended complaint alleged that various officials at the OCC "infringed Plaintiff's right to the free exercise of religion, guaranteed by the First Amendment of the United States Constitution, by limiting the Plaintiff's access to the Center's sweat lodge to morning hours on weekends and holidays."[2]  *Id.* at 48.  Like his second amended complaint, the appellant's third amended complaint generally alleged (without any mention of a half-hour, daily prayer) that various officials at the OCC were infringing upon his First Amendment rights.

The prison grievances, requesting daily access to the sweat lodge, were attached to the defendant's motion for summary judgment. Plaintiff's resistance to the motion gave no indication that the plaintiff was requesting

anything less than the full four hours required for a daily Sweat Lodge Ceremony. Plaintiff's affidavit, filed in support of the resistance, included the following statement: "(5) An integral part of the Sweat Lodge Ceremony is the offering of prayer to our Creator, and daily prayer is a necessary and essential tenet of my religious beliefs."

But perhaps the most telling sign that the appellant never raised the half-hour, daily prayer issue at the district court level lies in the magistrate judge's report and recommendation, which recommended granting the appellee's motion for summary judgment, and the appellant's response to that report and recommendation.  At pages 27 and 28 of his report and recommendation, the magistrate judge states that:

Native Americans had more scheduled hours of worship than any other religious group at OCC.  Plaintiff, however, alleges his constitutional rights were violated because he did not have daily access to the sweat lodge.

Defendants state the times scheduled for sweat lodge use "have security related limitations [and the limitation on sweat lodge use] is consistent with the type of considerations [given] to other religious groups" within OCC (Exhibit H).  Defendants, however, do not articulate these security-related limitations.

The record further shows Christians had access to the Chapel from 12:30 to 1:00 p.m. Monday through Thursday and on Sunday morning for one hour.  Muslims had access Saturday through Thursday from 1:00 to 1:30 p.m. and on Fridays from 1:30 to 3:00 p.m.  Defendants state sweat lodge use is not scheduled for half hour intervals following the noon meal because unlike Christian and Muslim services,

1. There is apparently a half-hour time limitation on services after the noon meal because inmates "are expected to be at work or at other scheduled programming" on weekdays.  J.A. at 87.

2. The sweat lodge was available for three-hour, sweat ceremonies on Saturday mornings, Sunday mornings, and holidays.  It was available for longer periods of time on these days if participation levels were high enough.  During the summer, the sweat lodge was also available on Wednesday evenings for a two and a half-hour

sweat ceremony.  Native Americans were also given access to a medicine man at least four times a year (more if the inmates themselves arranged any visits).  And like all other religious denominations, Native Americans had access to the nondenominational, prison chapel on a daily basis.  In comparison, the Christians were limited to three hours a week of "scheduled" services and the Muslims enjoyed five hours a week of "scheduled" services.

"sweat lodge ceremonies take longer than one half hour to prepare and complete." (Exhibit I). There is apparently a one half hour time limitation on services after the noon meal because inmates "are expected to be at work or at other scheduled programming" on weekdays (Exhibit I). Thus in addition to possible security concerns, the time limitations on sweat lodge access seem to be primarily related to the legitimate penological interests of institutional order and discipline. Sweat lodge ceremonies are simply too lengthy to be accommodated within the weekday work and programming schedules set up by OCC officials. A court should not mandate how experienced prison officials structure and schedule daily life at the prison. Allowing Native Americans to be in the sweat lodge for periods of time greater than the half hour allowed each day for chapel use by other inmates could create animosity among the inmates resulting in safety risks. It would also disrupt the scheduled programming within the institution.

J.A. at 133–34.

In his objections to the magistrate judge's report and recommendation, the appellant generally asserted that the magistrate judge's ruling on the sweat lodge issue was "based on erroneous findings" and that the magistrate judge did "not give [Thomas] the benefit of all factual inferences." *Id.* at 138. Noticeably absent from the appellant's statement of objections was any mention of a half-hour, daily prayer. Since the magistrate judge clearly referenced the need to limit afternoon daily prayer sessions to a half-hour, the appellant could have easily stated in his objections that he was merely seeking a half-hour prayer session.

Since the appellant did not raise the half-hour, daily prayer issue at either the prison grievance level or the district court level (after being afforded ample opportunities to do so), I am compelled to dissent and would affirm the district court's grant of summary judgment on the constitutional issue. *See Dorothy J. v. Little Rock Sch. Dist.,* 7 F.3d 729, 734 (8th Cir.1993); *see also Williams v. Willits,* 853 F.2d 586, 588 (8th Cir.1988) (dis-

trict court was not required to "pretend that certain facts exist in order to foresee a theory of recovery not actually raised or reasonably inferred by the pleader."); *Hanson v. Town of Flower Mound,* 679 F.2d 497, 504 (5th Cir.1982) (while complaints are to be liberally construed, "an attempt to amend one's pleadings in an appellate brief comes too late.")

I would also affirm the district court's grant of summary judgment on the qualified immunity issue. Like the court, I agree that the right of free exercise of religion within a penal setting is a clearly recognized right. Unlike the court, however, I am unwilling to find that the OCC officials acted unreasonably in denying the appellant access to the sweat lodge on a daily basis. I have been unable to find any cases which hold that inmates must be given daily access to a special facility such as the sweat lodge. Furthermore, given the fact that the OCC constructed a sweat lodge—when at least one circuit court has held that a prison is under no constitutional obligation to even build one [3]—and given the fact the Native Americans already enjoy more scheduled services (anywhere from 6 hours to 8.5 hours to 18 hours depending on participation levels) than the Christians (3 hours a week—9:00 to 10:00 a.m. on Sunday and 12:30 to 1:00 p.m. Monday through Thursday), the Muslims (5 hours a week—1:00 to 1:30 p.m. everyday of the week and additionally from 1:30 to 3:00 p.m. on Friday afternoon), and the various other denominations, I cannot conclude that the OCC officials were unreasonably ignoring the religious rights of Native Americans. *See Allen v. Toombs,* 827 F.2d 563, 566 (9th Cir.1987) (inmates only entitled to a single, weekly sweat lodge ceremony). The OCC officials have taken necessary steps to ensure that the Native Americans are free to pursue their religion. Accordingly, I would affirm the district court's grant of summary judgment in favor of the OCC officials on the qualified immunity issue.

**3.** *Walker v. Celeste,* 1992 WL 34387, * 1, 1992 U.S.App. LEXIS 2821, * 3 (6th Cir.1992) (prison

under no constitutional obligation to even build a sweat lodge).