BEAM, Circuit Judge.
Mark Juan Hamilton, an American Indian, initiated the present action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, alleging that Missouri prison officials (prison offi-ciáis) violated his First Amendment right to free exercise of religion by requiring him to cut his hair and by denying him access to a sweat lodge. Applying the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, the district court enjoined prison officials from enforcing a hair length regulation and ordered them to provide a weekly sweat lodge ceremony. Prison officials appeal. Because the prison regulation and policy at issue do not violate Hamilton’s right to free exercise of religion as protected by the First Amendment and RFRA, we reverse.
I. BACKGROUND
Hamilton is incarcerated at the maximum security Potosí Correctional Center (Potosí).[1] The facility provides cross-denominational religious facilities inside prison buildings. American Indian inmates at Potosí are allowed to pray, to gather together for regularly scheduled services, to meet with outside spiritual leaders, and to obtain religious reading material from the library. American Indians are also allowed to carry medicine bags containing ceremonial items and have access to a ceremonial pipe and kinnikinnik (a ceremonial “tobacco” consisting of willow, sweet grass, sage and cedar). Potosí does not allow a sweat lodge, sweat lodge ceremony, or fires on the premises. Potosí officials enforce a Missouri Department of Corrections regulation that prohibits hair length beyond the collar for male inmates. Hamilton asserts that prison officials violated his First Amendment right to free exercise of religion by denying him and other American Indian prisoners access to a sweat lodge and by requiring their compliance with the hair length regulation.
Hamilton brought the present action seeking injunctive relief, damages and attorney fees. Hamilton’s damage claims were dismissed and are not before us on appeal. A hearing was held on March 29 and 30, 1994, on Hamilton’s equitable demands.
A. Hair Length
Hamilton testified that American Indian males believe that their hair is a gift from *1548 the Creator and is to be cut only when someone close to them dies. Hamilton and other American Indian inmates had long hair but were forced to cut it at the Potosí prison. Hamilton testified that at one time his hair was four-feet long.
Prison officials testified that long hair poses a threat to prison safety and security. Stephen Long, the Assistant Director of Adult Institutions for the Missouri Department of Corrections, testified that inmates could conceal contraband, including dangerous materials, in their long hair. Long stated that without the hair length regulation, prison staff would be required to perform more frequent searches of inmates, which could cause conflicts between staff and inmates. Searching an inmate’s long hair would be difficult, especially if the inmate’s long hair were braided. Long also testified that the prison had tried to control gangs by not allowing them to identify themselves through colors, clothes, or hair carvings. He testified that exempting American Indians from the hair length regulation could cause resentment by the other inmates. He concluded that there was no alternative to the hair length policy because only short hair can easily be searched and remain free of contraband. Finally, Long noted that long hair could also cause problems with inmate identification.
B. Sweat Lodge
The sweat lodge ceremony primarily takes place inside a dome-shaped structure constructed of bent willow poles and covered with hides, blankets, or tarps. Rocks heated in a separate fire are placed in the center of the lodge. During the ceremony, several tools are used including an axe (to split the firewood), a shovel (to transfer the hot rocks from the fire to the sweat lodge) and deer antlers. Participants, who are nude, pour water on the hot rocks to create steam, which causes them to sweat. Throughout the ceremony, the lodge remains covered to retain the steam and to keep out the light. The ceremony lasts between one and three hours. When the lodge is not in use, the covers are removed but the willow poles remain intact.
Hamilton testified that the sweat lodge ceremony is instrumental to the practice of his religion because it purifies the participant. Purity, according to Hamilton, is a prerequisite to participating in other religious ceremonies, such as offering prayers and smoking the sacred pipe. Hamilton also testified that participants in these ceremonies must be seated outdoors on the ground. Hamilton stated that if he could not have access to a sweat lodge ceremony, he would not and could not practice any aspect of his religion.
Hamilton introduced deposition testimony from prison administrators in a few other states that their respective facilities conduct sweat lodge ceremonies without any major problems. These prison administrators conceded that they were aware of some problems, including rumors of sexual impropriety during the sweat lodge ceremony. No prisoner had filed a formal complaint and the prison guards were unable to observe what actually occurred inside the lodge.
The Potosí prison officials testified that the sweat lodge requested by Hamilton raised concerns of prison safety and security. Specifically, Long testified that the implements requested by Hamilton to conduct the sweat lodge ceremony, such as a shovel and an axe, could be used to assault other inmates and prison guards. Long further testified that problems arise when inmates in a maximum security prison, who are typically prone to violence, congregate in groups.
Alan Luebbers, the Associate Superintendent at Potosí, testified that inmates who work with tools are supervised by prison guards. The secluded nature of the sweat lodge would make such supervision impossible, thus providing the inmates with an opportunity to assault other inmates, make weapons, use drugs, dig a tunnel, and engage in homosexual activity. Normally, a prison guard is posted at religious functions to observe the inmates and ensure their safety.
Gary Tune, the Chaplain at the Potosí Correctional Center, testified that if a sweat lodge were built it would be the only facility devoted to a single religion. Assistant Director Long also expressed concern over allowing Hamilton, an inmate, to decide who *1549 may or may not use the sweat lodge. He concluded that providing a sweat lodge may cause resentment among the inmates.
Jodie Jackson, the Chaplaincy Coordinator for the Missouri Department of Corrections, testified that some American Indian inmates at other Missouri state prisons practiced their religion outdoors on the ground without the benefit of a sweat lodge. Those prisoners offered prayers, observed special seasons, and smoked the ceremonial pipe. Jackson testified that Hamilton had not requested permission to practice his religion outdoors in a manner similar to that at other institutions. Jackson stated, however, that the Missouri Department of Corrections would consider such a request if it were made.
The district court found “that the regulations and policies at issue in this lawsuit with regard to plaintiffs practice of his ... religion substantially [burden] plaintiffs exercise of his religion.” Hamilton v. Schriro, 868 F.Supp. 1019, 1024 (W.D.Mo.1994). The district court held that “[ajlthough safety, security and cost concerns may be shown to be compelling governmental interests in the prison setting, defendants have not shown that the regulations and practices used by the Missouri Department of Corrections are the least restrictive means of furthering that interest.” Id. The district court enjoined enforcement of the hair length regulation and ordered the prison officials to allow Hamilton to practice his religion, including a weekly sweat lodge ceremony. Id. at 1020. In a subsequent order, the district court awarded attorney fees to Hamilton. The district court also stated “that for 6 months after the sweat lodge becomes operational and the ceremony is implemented, participation in the sweat lodge ceremony shall be limited to those who are sincere adherents of the Native American religion or to those who have been approved for participation by majority vote of Native Americans who practice the Native American religion and are scheduled to participate in the ceremony.” Hamilton v. Schriro, No. 91-4373, Amended Judgment (W.D.Mo. Nov. 21, 1994).
On appeal, the prison officials contend that: (1) Hamilton is not sincere in his adherence to the American Indian religion; (2) the prison regulations and policies do not substantially burden Hamilton’s free exercise of his religious beliefs; and (3) the limitations imposed on hair length and sweat lodges are the least restrictive means of furthering the compelling interest of maintaining prison safety and security. The prison officials also assert that under any circumstances, the condition imposed by the district court on who may participate in the sweat lodge ceremony is unprecedented and unreasonable.
II. DISCUSSION
As with any section 1983 action, we must determine: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; Thomas v. Gunter, 32 F.3d 1258, 1259 (8th Cir.1994). Because the prison officials were acting under color of state law, the first requirement of this two-part test is satisfied. Gunter, 32 F.3d at 1259.
Turning to the second requirement, Hamilton’s section 1983 action was originally based on the claim that the prison officials deprived him of his First Amendment right to the free exercise of his religion.[2] After this action was initiated, however, Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb. RFRA applies retroactively. See Brown-El v. Harris, 26 F.3d 68, 69 (8th Cir.1994). Therefore, Hamilton’s section 1983 action now encompasses two separate theories: (1) deprivation of his constitutionally protected First Amendment right to the free exercise of his religion; and (2) deprivation of his statutorily protected right, under RFRA, to the free exercise of his religion. See generally Goodall v. Stafford County Sch. Bd., 60 F.3d 168, 170 (4th Cir.1995), cert. denied, — U.S. -, 116 S.Ct. 706, 133 L.Ed.2d 661 *1550 (1996).[3] We hold that Hamilton has failed to establish a deprivation under either his constitutional or statutory right to free exercise of religion.[4] Because we hold that Hamilton’s section 1983 action fails under either constitutional or RFRA analysis, we need not and do not consider the constitutionality of RFRA.[5]
A. Constitutional Analysis
Prison inmates “do not forfeit all constitutional protections by reason of their conviction and confinement in prison.” Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Moreover, “federal courts must take cognizance of the valid constitutional claims of prison inmates,” Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987), which include actions based on free exercise rights protected by the First Amendment. See Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).
However, “ ‘[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.’ ” Jones v. North Carolina Prisoners’ Labor Union, Inc., 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977) (quoting Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)). “The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.” Jones, 433 U.S. at 125, 97 S.Ct. at 2537. Furthermore, “‘issues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-suited to judicial resolution, and ... accordingly, courts should be loath to substitute their judgment for that of prison officials and administrators.’ ” Iron Eyes v. Henry, 907 F.2d 810, 812 (8th Cir.1990) (quoting Pitts v. Thornburgh, 866 F.2d 1450, 1453 (D.C.Cir.1989)).
An inmate who challenges the constitutionality of a prison regulation or policy that limits the practice of religion must first establish that it infringes upon a sincerely held religious belief. Hill v. Blackwell, 774 F.2d 338, 342-43 (8th Cir.1985). In the present case, we assume that Hamilton’s religious beliefs are sincerely held. See Iron Eyes, 907 F.2d at 813 (determining the sincerity of a person’s religious belief “is factual in nature and thus is subject to the clearly erroneous standard of review”).
A prisoner’s free exercise claim is “judged under a ‘reasonableness’ test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.” O’Lone v. Estate of Shabazz, 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); see also Turner, 482 U.S. at 87-91, 107 S.Ct. at 2260-63. In Turner, the Supreme Court articulated the applicable constitutional test in the context of prison regulations: “when a prison regulation impinges on inmates’ constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.” 482 U.S. at 89, 107 S.Ct. at 2261. Prison security is one of these penological interests. O’Lone, 482 U.S. at 348, 107 S.Ct. *1551 at 2404. Several factors are to be considered when evaluating the reasonableness of a prison regulation: (1) whether there is a valid, rational connection between the regulation and the asserted governmental interest; (2) whether alternative means for exercising the right remain open to the prisoner; (3) the impact of the regulation on prison staff, other inmates, and the allocation of prison resources; and (4) the availability of ready alternatives to the regulation. Turner, 482 U.S. at 89-91, 107 S.Ct. at 2261-63.
1. Hair Length Regulation
We have previously applied the Turner factors to an American Indian prisoner’s claim that hair length regulations violated his constitutionally guaranteed right to free exercise of religion and concluded that such a regulation passes constitutional muster. Iron Eyes, 907 F.2d at 813-16. Our prior decisions make it abundantly clear that Hamilton’s constitutional challenge to the prison hair length regulation must fail. Id.; see also Sours v. Long, 978 F.2d 1086 (8th Cir.1992) (per curiam); Kemp v. Moore, 946 F.2d 588 (8th Cir.1991) (per curiam), cert. denied, 504 U.S. 917, 112 S.Ct. 1958, 118 L.Ed.2d 560 (1992). Therefore, we conclude that under the Turner criteria, Hamilton’s free exercise right is outweighed by the validity of the regulation. See Iron Eyes, 907 F.2d at 816.
2. Sweat Lodge
As with prison hair length regulations, we have previously resolved the issue of whether a prison official’s denial of access to a sweat lodge violates an American Indian inmate’s free exercise right under the First Amendment. Kemp, 946 F.2d 588 (affirming the district court’s decision denying a prisoner’s request for an order to require the construction of a sweat lodge). In a recent case, however, we acknowledged that such a determination “depends upon whether the restriction imposed by prison authorities bears a rational relationship to the furtherance of a legitimate penological interest.” Thomas v. Gunter, 32 F.3d 1258, 1260 (8th Cir.1994) (concluding that the district court improperly granted summary judgment for prison authorities because their justification for denying the inmate sweat lodge access was based on “security-related limitations,” which did not provide a sufficiently specific basis to determine if some rational relationship existed between the denial of access and security). Applying the Turner factors to the present case, we conclude that the prison officials’ denial of Hamilton’s access to a sweat lodge was rationally related to the legitimate peno-logical interests of safety and security at Potosi.
First, prohibiting Hamilton and other inmates from meeting in a completely enclosed area is rationally connected to preventing the type of harm prison officials fear would occur in the sweat lodge. Second, alternative means remain open to Hamilton for exercising his religion, including carrying a medicine bag containing ceremonial items, having access to a ceremonial pipe and kmmkinnik, and praying with other American Indian inmates. Third, accommodating Hamilton’s request for a sweat lodge would have an adverse impact on prison staff, other inmates, and prison resources due to the risk of assaulting participants in the ceremony, as well as possible resentment resulting from the erection of an exclusive religious facility. Finally, Hamilton has failed to “point to an alternative that fully accommodates the prisoner’s rights at de minimis cost to valid penological interests.” Turner, 482 U.S. at 91, 107 S.Ct. at 2262.
Therefore, we hold that the constitutional claim underlying Hamilton’s section 1983 action fails. Our prior decisions make it clear that enforcing prison hair length regulations, such as the one at issue in the present case, and prohibiting sweat lodge ceremonies do not violate an inmate’s constitutional right to free exercise of religion. Additionally, the applicable constitutional analysis articulated by the Supreme Court in Turner supports our conclusion that the prison officials’ failure to provide Hamilton with a sweat lodge does not violate his right to free exercise of religion.
B. RFRA Analysis
In 1993, Congress enacted RFRA, which statutorily created a compelling interest-least *1552 restrictive means test[6] to be applied to all cases where free exercise of religion is substantially burdened. 42 U.S.C. § 2000bb(b)(1). The stated purpose of enacting RFRA was “to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened.” 42 U.S.C. § 2000bb(b)(1).[7] In addition, Congress intended “to restore traditional protection afforded to prisoners’ claims prior to O’Lone.” S.Rep. No. 111, 103d Cong., 1st Sess. (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1899 (Senate Report). See also 139 Cong.Rec. S14468 (daily ed. Oct. 27,1993) (recording the Senate vote rejecting a proposed amendment that would have excluded prisoners’ free exercise claims from the compelling interest standard in RFRA). Congress intended for RFRA “to provide a claim or defense to persons whose religious exercise is substantially burdened by government.” 42 U.S.C. § 2000bb(b)(2).
For purposes of our analysis, we assume that the regulations and policies at issue in the present ease substantially burden Hamilton’s exercise of his religion. Hamilton, 863 F.Supp. at 1024. The district court acknowledged that “safety, security and cost concerns may be shown to be compelling governmental interests in the prison setting.” Id. See also Pell, 417 U.S. at 823, 94 S.Ct. at 2804-05. Under RFRA, the prison officials bear the burden of demonstrating that the regulation is the least restrictive means of achieving a compelling interest. 42 U.S.C. § 2000bb-1(b). Therefore, the primary question before us is whether the district court erred in holding that the prison policies and regulations at issue were not the least restrictive means of achieving the compelling interest of prison safety and security.
The district court’s conclusion that the prison officials failed to satisfy the statutorily imposed test under RFRA is a question of law which is subject to de novo review. While the district court’s findings of fact are subject to a clearly erroneous standard of review, the ultimate conclusion as to whether the regulation deprives Hamilton of his free exercise right is a question of law subject to de novo review. See Hill, 774 F.2d at 343. We find that applying the least restrictive means prong of RFRA also raises an issue of statutory construction, which is subject to de novo review. See generally Department of Social Serv. v. Bowen, 804 F.2d 1035, 1037 (8th Cir.1986).
Prer-O’Lone ease law and RFRA’s legislative history indicate that the applicable test must be construed in the prison setting, giving due deference to the expert judgment of prison administrators. See generally Abbott Cooper, Comment, Dam the RFRA at the Prison Gate: The Religious Freedom Restoration Act’s Impact on Correctional Litigation, 56 Mont.L.Rev. 325 (1995). The legislative history of RFRA also shows that while Congress intended for the same compelling interest test in the statute to apply to prisoners as well as non-prisoners, the outcome of the analysis would depend upon the context. It was noted in the Senate Report that:
*1553 The Religious Freedom Restoration Act would establish one standard for testing claims of Government infringement on religious practices. This single test, however, should be interpreted with regard to the relevant circumstances in each case.
Senate Report at 9, 1993 U.S.C.C.A.N. at 1898. Thus, while Congress intended to revoke O’Lone, it did not intend to impose a more rigorous standard than the one that was applied prior to O’Lone. Id. Therefore, pre-O’Lone ease law provides useful guidance on how to interpret the test in RFRA and how to resolve the present case.
The Supreme Court has long recognized the need to defer to the judgment of prison administrators when evaluating the validity of a prison regulation that impinges an inmate’s First Amendment rights. See, e.g., Procunier v. Martinez, 416 U.S. 396, 404-05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). In Martinez, the Court held, among other things, that a prison mail censorship regulation was invalid. Id. at 415-16, 94 S.Ct. at 1812-13. Nevertheless, the Supreme Court noted: “[Cjourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.... Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.” Id. at 405, 94 S.Ct. at 1807. In Jones, 433 U.S. at 125, 97 S.Ct. at 2537, the Court upheld prison regulations that prohibited meetings of prisoners’ labor unions, solicitations to join the union, and bulk mailings concerning the union from outside sources against a First Amendment challenge, noting that the lower court “got off on the wrong foot ... by not giving appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement.” In Pell, the Court rejected the inmates’ First Amendment challenge to the ban on media interviews, noting that judgments regarding prison security “are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.” 417 U.S. at 827, 94 S.Ct. at 2806 (emphasis added); see also Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Therefore, even prior to the reasonableness test expressly set out in O’Lone, the Supreme Court afforded deference to the judgment of prison administrators when evaluating the validity of a prison regulation. See Thornburgh v. Abbott, 490 U.S. 401, 411, 109 S.Ct. 1874, 1880, 104 L.Ed.2d 459 (1989) (in adopting the reasonableness test set out in Turner and overruling Martinez, the Court stated: “We do not believe that Martinez should, or need, be read as subjecting the decisions of prison officials to a strict ‘least restrictive means’ test.”); Turner, 482 U.S. at 87, 107 S.Ct. at 2260-61.[8]
We have applied the pre-O’Lowe Supreme Court test in the context of a prisoner’s First Amendment right to the free exercise of religion. See Hill, 774 F.2d at 340-43; Rogers v. Scurr, 676 F.2d 1211, 1215 (8th Cir.1982) (“[Wjhen the maintenance of institutional security is at issue, prison officials ordinarily must have wide latitude within which to make appropriate limitations.”). Thus, prior to O’Lone, we applied a test that required balancing the need for a particular regulation and the invasion of religious freedom that the restriction caused. Hill, 774 F.2d at 342 (citing Pell, 417 U.S. at 822-23, 94 S.Ct. at 2804-05); see also Murphy v. Missouri Dep’t of Corrections, 814 F.2d 1252, 1256 (8th Cir.1987). The Senate Report shows that RFRA was intended to restore this balancing test: *1554 Senate Report at 9-10, 1993 U.S.C.C.A.N. at 1899.[9] Prison safety and security are peno-logical concerns of the highest order.
*1553 Prior to O’Lone, courts used a balancing test in cases where an inmate’s free exercise rights were burdened by an institutional regulation; only regulations based upon penological concerns of the “highest order” could outweigh an inmate’s claims.
*1554 This balancing test mandates that limitations on free exercise rights “be no greater than necessary to protect the governmental interest involved[.]” Scurr, 676 F.2d at 1215 (citing Procunier v. Martinez, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974)). In the prison context, however, prison officials ordinarily must have wide latitude within which to make appropriate limitations to maintain institutional security. Id. This is because “central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.” Pell, 417 U.S. at 823, 94 S.Ct. at 2804.
We find the “no greater than necessary” requirement to be functionally synonymous with the “least restrictive means” prong of the RFRA test when applied in the prison context. Because we are faced with a prison case where the maintenance of institutional security is at issue, we must give the prison officials wide latitude within which to make appropriate limitations.
Our interpretation and application of the least restrictive means prong of the RFRA test is consistent with the statute’s legislative history. Significantly, the legislative history of RFRA recognizes the necessity for courts to continue deferring to the judgment of prison officials.
The committee [on the Judiciary] does not intend the act [RFRA] to impose a standard that would exacerbate the difficult and complex challenges of operating the Nation’s prisons and jails in a safe and secure manner. Accordingly, the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.
Senate Report at 10, 1993 U.S.C.C.A.N. at 1899-1900 (footnote omitted). In fact, the Senate rejected a proposed amendment that would have excluded prisoners from the scope of RFRA, finding that such an express exclusion was not necessary because courts had been extremely deferential to prison authorities. See 139 Cong.Rec. S14467 (daily ed. Oct. 27, 1993). Senator Danforth concluded that “RFRA mandates a uniform test, not a uniform result.” Id.
Therefore, both pr e-O’Lone Supreme Court case law and the relevant legislative history indicate that a court applying RFRA must give due deference to the expertise of prison officials in establishing regulations to maintain prison safety and security, even when the court applies a “heightened” standard of review.[10] We hold that the prison officials in the present case demonstrated that the prison regulation and policy at issue are the least restrictive means of maintaining the prison’s compelling interest in institutional safety and security.
1. Hair Length Regulation
As earlier noted, prison officials testified that prison security requires them to prevent inmates from concealing contraband in their long hair and identifying with a particular gang. The prison officials also testified that preventing male inmates from growing their hair longer than collar length is the least restrictive way to achieve that goal because no viable alternatives exist.
Our prior case law supports the conclusion that the prison officials may enforce a hair length regulation such as the one at issue in the present case. Cf. Iron Eyes, 907 F.2d at 815-16 (applying the reasonableness test set out in O’Lone to a prison hair length regúla *1555 tion we concluded that “[a]ny other solution would come at more than a de minimis cost to valid penological interests”).[11] In an analogous situation, we held, under the pre-O’Lone standard, that prison officials could prohibit Muslim inmates from wearing religious caps and robes outside prayer meetings because such attire made it too easy to conceal contraband. Scurr, 676 F.2d at 1215. We stated that the prison authorities’ explanation was “eminently reasonable, particularly in view of the fact that operating personnel is limited.” Id.
It is more than merely “eminently reasonable” for a maximum security prison to prohibit inmates from having long hair in which they could conceal contraband and weapons. It is compelling. Further, it is important for prison administrators to prevent inmates from identifying with particular gangs through their hair style. The safety and security concerns expressed by prison officials were based on their collective experience of administering correctional facilities. These are valid and weighty concerns. Moreover, there is no viable less restrictive means of addressing these concerns.[12] Therefore, we conclude that the district court erred in its interpretation and application of the least restrictive means prong of the compelling interest test in RFRA. The district court failed to give due deference to the prison officials’ testimony that long hair presented a risk to prison safety and security and that no viable less restrictive means of achieving that goal existed.
2. Sweat Lodge
The prison officials asserted that to maintain prison security they must prevent inmates from assaulting each other, escaping, using drugs, and engaging in homosexual conduct. The prison officials testified that a traditional American Indian sweat lodge would provide inmates with an opportunity to engage in these activities without being seen by prison guards. Moreover, the prison officials testified that providing specific inmates with their own exclusive religious facility would appear to other inmates as an act of favoritism and would lead to resentment. According to prison officials, prohibition of the sweat lodge ceremony is the least restrictive means of ensuring prison safety and security because Hamilton has refused to consider any type of modified ceremony where participants would be allowed to pray outside on the ground without the opaque covering.[13]
*1556 Although RFRA places the burden of production and persuasion on the prison officials,[14] once the government provides this evidence, the prisoner must demonstrate what, if any, less restrictive means remain unexplored. It would be a herculean burden to require prison administrators to refute every conceivable option in order to satisfy the least restrictive means prong of RFRA. Moreover, such an onerous requirement would be irreconcilable with the well-established principle, recognized by the Supreme Court and RFRA’s legislative history, that prison administrators must be accorded due deference in creating regulations and policies directed at the maintenance of prison safety and security. See O’Lone, 482 U.S. at 350, 107 S.Ct. at 2405.
Prison officials testified that they would consider a proposal to allow American Indian inmates to meet outdoors on the ground to pray and conduct the pipe ceremony. According to prison officials, American Indian inmates at other Missouri prisons are allowed to participate in various ceremonies outdoors on the ground without a sweat lodge. This type of modified ceremony would eliminate a primary concern of prison officials, namely the inability of prison guards to observe the inmates in the lodge. Hamilton testified, however, that he would not and could not practice his religion in any capacity if he were not allowed to participate in a sweat lodge ceremony.
This case presents the unusual situation where the government has satisfied the least restrictive means prong by demonstrating that other less restrictive alternatives are not acceptable to the plaintiff. See Cheema v. Thompson, 67 F.3d 883, 894 (9th Cir.1995) (Wiggins, J., dissenting) (noting that the case presented a unique question of least restrictive means analysis because the plaintiffs have taken an all-or-nothing position). Hamilton’s own all-or-nothing position supports the prison officials’ contention that an outright prohibition against a sweat lodge ceremony is the least restrictive means of achieving the compelling interests of prison safety and security in this case.
Hamilton testified that the sweat lodge ceremony could probably be conducted without the axe. Hamilton also “invited” prison guards to participate in the sweat lodge ceremony with the prisoners. Neither of Hamilton’s suggestions, however, adequately addresses the prison officials’ concerns. First, the axe is only one of several potentially dangerous instruments used in the sweat lodge ceremony. Thus, conducting the sweat lodge ceremony without the axe would not obviate the risk that the other instruments (e.g., deer antlers) would be used as a weapon. Second, the physical characteristics of the sweat lodge (i.e., low doorway and no light) would create a serious risk to prison guards searching the lodge during a ceremony. Thus, the prison officials’ concern that the participants could engage in prohibited conduct while inside the opaque lodge are not alleviated.
There may very well be less restrictive means of achieving prison safety and security than completely prohibiting sweat lodge ceremonies. Justice Blackmun recognized the dilemma implicit in a least restrictive means analysis: “A judge would be unimaginative indeed if he could not come up with something a little less ‘drastic’ or a little less ‘restrictive’ in almost any situation, and thereby enable himself to vote to strike legislation down.” Illinois State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 188-89, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring). Hamilton has failed to enlighten us as to any viable less restrictive means that may remain available to the prison officials short of prohibiting the sweat lodge ceremony entirely. Accordingly, we hold that the prison officials have satisfied their burden under RFRA.[15]
*1557 III. CONCLUSION
In sum, we hold that the district court failed to give due deference to prison officials who testified as to the necessity of the prison hair length regulation and prohibition against a sweat lodge to maintain prison safety and security. Because the least restrictive means prong of the compelling interest test in RFRA requires no more than the pre-O’Lone eases required, the prison officials’ justifications for the hair length regulation and prohibition of a sweat lodge ceremony were sufficient. On these facts we conclude that the prison regulations at issue do not violate Hamilton’s right to the free exercise of religion as protected by the Constitution and RFRA. Our decision does not, however, foreclose the possibility of a successful sweat lodge claim under different circumstances. Furthermore, we encourage prisons to accommodate the religious needs of inmates, including American Indian inmates, by providing facilities beyond the bare minimum. Accordingly, the district court’s decision and award of attorney fees is reversed. All pending motions before this court are overruled.

. Hamilton was incarcerated at the Jefferson City prison when he initiated this action. Hamilton was subsequently transferred to Potosí, where he was incarcerated at the time of the hearing in 1994.

. The First Amendment provides in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; U.S. Const. amend. I.

. Some courts and commentators apparently interpret RFRA as legislatively creating a compelling interest test that is to be applied in all free exercise cases, thereby completely supplanting prior constitutional standards. Even if Congress has the authority to mandate such an approach, Hamilton’s claim would fail under the test set out in RFRA. See infra Part II.B.

. Although the district court resolved the present case only under RFRA, we think it is necessary to address the constitutional claim because the district court suggested that it would have found for Hamilton even under the constitutional analysis. Hamilton, 863 F.Supp. at 1022.

.See, e.g., United States v. Congress of Indus. Org., 335 U.S. 106, 125, 68 S.Ct. 1349, 1358-59, 92 L.Ed. 1849 (1948) (Frankfurter, J., concurring) (" 'No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act.... [I]f the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.’ Ex parte Randolph, 20 Fed.Cas. No. 11,558 at 254, 2 Brock. 447, 478-79 (C.C.D.Va.1833).”). Moreover, if RFRA were held to be unconstitutional in the future, that determination would not affect the validity of our holding in the present case.

. The statute provides in relevant part:
(a) In general
Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
(b) Exception
Government may substantially burden a person’s exercise of religion only if it demonstrates that application of the burden to the person—
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.
42 U.S.C. 2000bb-1(a), (b).

. Congress enacted RFRA in response the Supreme Court's holding in Employment Div., Dep't of Human Resources of Oregon v. Smith, 494 U.S. 872, 886 n. 3, 110 S.Ct. 1595, 1604 n. 3, 108 L.Ed.2d 876 (1990), that "generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest.” 42 U.S.C. § 2000bb(a)(4) (finding that in Smith, "the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion”).

. Another circuit was also "persuaded ... by the reasoning of Wolfish, Pell, and Martinez that [the pre-O'Lone test required] prisoner free exercise claims [to] be judged in accordance with a standard different from that applied outside the prison.” Madyun v. Franzen, 704 F.2d 954, 959 (7th Cir.), cert. denied, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983).

. Although there were several versions of the applicable test prior to O'Lone, see generally Mary A. Schnabel, Comment, The Religious Freedom Restoration Act: A Prison's Dilemma, 29 Willamette L.Rev. 323 (1993), we look to Supreme Court precedent, RFRA's legislative history, and our own case law for guidance.

. Of course, this is not to say that a reviewing court must accept the justification articulated by prison authorities in all cases. In order to satisfy their burden under RFRA, prison authorities must do more than offer conclusory statements and post hoc rationalizations for their conduct. Senate Report at 10, 1993 U.S.C.C.A.N. at 1900.

. Hamilton argues that our prior decision in Tetenid v. Burns, 522 F.2d 357 (8th Cir.1975) is dispositive of the hair length regulation. Hamilton’s reliance on Tetenid is misplaced. In Teter-ud, we noted that “the only reason advanced in support of the regulation was the Warden's opinion, unsupported by empirical proof, that the hair net and reidentification requirements necessitated by allowing long hair would create a ‘hassle’ between correction officers and inmates.” Id. at 361; see also Hill, 774 F.2d at 341-42 (distinguishing Tetemd on the basis that “the [W]arden's justification for the regulation was not founded on a legitimate concern for prison security, and there was no need to decide whether the prison officials had exaggerated their response to a legitimate security consideration”). In the present case, the hair length regulation was founded on the legitimate concern that prison safety would be compromised by inmates concealing contraband in their long hair or identifying with a particular gang.

. Although no other circuit has yet decided whether RFRA precludes prison hair length regulations, several district courts have upheld such regulations against RFRA challenges. Phipps v. Parker, 879 F.Supp. 734, 736 (W.D.Ky.1995) (holding that “cutting inmates’ hair short appears to be the only plausible way to meet these safety concerns, and thus satisfies the requirement that the least restrictive means available be used to achieve the compelling interests”); Diaz v. Collins, 872 F.Supp. 353, 359 (E.D.Tex.1994) ("The potential of hiding contraband in long hair cannot be vitiated except through a regulation that hair be kept short."). In Phipps, the district court recognized that “[wjhile other methods might be used, such as constantly searching inmates for contraband, such means would be impractical and just as likely to burden constitu- - tional interests.” 879 F.Supp. at 736. These cases support our conclusion that the district court in the present case failed to give due deference to the expert judgment of prison officials who testified that no viable alternative existed to the hair length regulation.

.To date, no circuit has decided whether RFRA protects an American Indian’s free exercise right to the extent that a prison must provide a sweat lodge. In Werner v. McCotter, 49 F.3d 1476, 1480 (10th Cir.1995), cert. denied, - U.S. -, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995), the court acknowledged that an American Indian prisoner had made out a prima facie case under RFRA, but remanded the case to the district *1556 court because the record was almost devoid of the facts necessary to allow the court to balance the governmental interest at stake against the restrictions placed on the inmate.

. "As used in [RFRA] ... the term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion[.]" 42 U.S.C. § 2000bb-2(3).

. A remand to the district court is not necessary in this case because the record contains sufficient factual support for our conclusion that the prison officials have satisfied their burden under *1557 RFRA. We recognize that additional evidence was placed in the record as part of Hamilton's post-judgment motion to preserve the status quo. However, we rely only on the evidence that was before the district court to reach our conclusion.
The district court relied on the deposition testimony of prison administrators from a few other states that they were conducting sweat lodge ceremonies without the problems envisioned by the Missouri prison officials. See Hamilton, 863 F.Supp. at 1023. This deposition testimony, however, also revealed that the prison administrators were aware of various problems with the sweat lodges, including allegations of sexual improprieties occurring in the lodges. Prison administrators stated that no formal charges had been filed due to the reluctance of prisoners to testify and the fact that no prison guard could observe the participants while they were in the lodge.
The district court acknowledged that “Missouri corrections personnel relied on their experience in corrections work and on a belief that such practices would interfere with the safety and security of the institution.” Id. Although prison policies from other jurisdictions provide some evidence as to the feasibility of implementing a less restrictive means of achieving prison safety and security, it does not outweigh the deference owed to the expert judgment of prison officials who are infinitely more familiar with their own institutions than outside observers.